**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CRIMINAL NO. 05-319 (RMC)** |
| | : | |
| **JEFFREY DAVIS** | : | |
| | : | |
| **Defendant.** | : | |

_____

<u>**MEMORANDUM IN AID OF SENTENCING**</u>

Defendant Jeffrey Davis, through counsel, respectfully submits the following Memorandum in aid of his sentencing.

1.      On February 17, 2006, Jeffrey Davis will come before this Court to be sentenced pursuant to his guilty plea to a one Count Information.  Specifically, Mr. Davis pled guilty to Unlawful Possession With Intent to Distribute Five Grams or More of Cocaine Base (21 U.S.C. § 841(a)(1)).  According to the Pre-Sentence Report (PSR) prepared by the United States Probation Office, Mr. Davis's Total Offense Level is 23 and his Criminal History Category is Category V.  The PSR concludes that Mr. Davis's sentencing guideline range is 84-105 months.  Mr. Davis concurs with the guideline findings contained in the PSR.

2.      In this Memorandum, counsel for Mr. Davis argues that, due to various reasons, a sentence of sixty months is the most reasonable sentence in this case.

<u>**ARGUMENT**</u>

**I.      THE POST-<u>BOOKER</u> SENTENCING FRAMEWORK.**

Under Justice Breyer's majority opinion in <u>Booker</u>, the "district courts, while not bound to

1

apply the Guidelines, must consult those Guidelines and take them into account when sentencing. See 18 U.S.C. § 3553(a)(4)." United States v. Booker, 125 S.Ct. 738 (2005). While holding that district courts should still consider the Guideline calculations and ranges for sentencing purposes, the remedial majority in Booker held that courts must consider all the purposes of sentencing set forth in 18 U.S.C. § 3553(a). Pursuant to Booker, therefore, courts must treat the Guidelines as one, among several, sentencing factor.

Pursuant to 18 U.S.C. §§ 3562 and 3553(a) – which were explicitly endorsed by the Supreme Court in Booker – sentencing courts should consider the need for the sentence imposed:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with the needed educational and vocational training, medical care, or other correctional treatment in the most effective manner.

Specifically, courts should "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" set forth above.

Section 3553(a) further directs sentencing courts to consider the nature and circumstances of the offense, the history and characteristics of the defendant, the range of sentences available, the need to avoid unwanted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offenses charged.

Pursuant to 18 U.S.C. § 3661, also expressly endorsed by the Booker majority:

2

> No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purposes of imposing an appropriate sentence.

Section 3582 of Title 18 states that:

> [t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.

Taken together, the directives of <u>Booker</u>, as well as Sections 3553, 3661, and 3582 of Title 18, make it clear that sentencing courts may no longer consider the Guidelines alone in determining the appropriate sentence. After <u>Booker</u>, courts need not justify sentences outside the guideline range by citing factors that take the case outside the "heartland." Rather, as long as the sentence imposed is reasonable and supported by the factors outlined in Section 3553, courts may exercise their discretion in individual cases and impose sentences which are not within the proposed guideline range.

## II.    A SENTENCE OF SIXTY MONTHS IS THE MOST REASONABLE SENTENCE IN THIS CASE.

Due to a combination of factors, the most reasonable sentence in this case is a sentence of sixty months. A sentence of sixty months is a fair sentence and such a sentence is warranted based on the purposes of sentencing set forth in 18 U.S.C. § 3553. Based on such factors as the unjustifiable disparate sentencing guideline ranges for crack and powder cocaine and Mr. Davis's characteristics, a sentence below the advisory guideline range is justified in this case. Mr. Davis submits that the proper sentence in this case is a sentence of sixty months.

A.     **The Court Should Sentence Mr. Davis to a Period of Incarceration Which is Less Than the 84-105 Months Guideline Range in Order to Account for the 100:1 Crack/Powder Disparity.**

This Court should impose a sentence which is below the 84-105 month guideline range to account for the 100:1 crack/powder disparity built into the offense level for offenses involving crack cocaine. As set forth below, the dramatic disparity between sentences for powder and crack cocaine is unwarranted. If that disparity is reduced to 20:1--as advocated by the Sentencing Commission itself--Mr. Davis's offense level would be a 22. See U.S.S.G. § 2D1.1(c)(6) (offense level for between 3 and 4 grams of cocaine base and for between 300 and 400 grams of cocaine).[1] After reducing that offense level by 3 levels to account for Mr. Davis's acceptance of responsibility, the appropriate guideline range is **57-71 months.**

The argument against imposing a sentence that incorporates the 100:1 crack/powder disparity is based primarily upon the Sentencing Commission's own disavowal of the basis for that disparity. The Commission has issued several reports discounting the disparity.

1.     The 1995 Report

In February 1995, the Commission issued the first report, Special Report to the Congress: Cocaine and Federal Sentencing Policy (Feb. 1995) ("1995 Report"). The Report repudiated the still-existing crack sentencing structure.

The 1995 Report is a comprehensive study which analyzes and considers the appropriate level of punishment to be imposed for crack offenses by the very agency charged by Congress to

---

[1]     This offense level is arrived at by multiplying the total quantity of crack in this case (17.2 grams of crack) by 20, which converts it to powder. The resulting quantity is 344 grams, which produces a pre-acceptance offense level of 22 under the drug quantity table. See U.S.S.G. § 2D1.1(c)(9).

make sentencing determinations and recommendations.  See 28 U.S.C. § 994.  The report analyzes each factor perceived to be relevant to the distinction between crack and powder cocaine.  Many of the factors were found to provide no support for a higher penalty for crack.  Of "[t]he factors that suggest a difference between the two forms of cocaine," however, the Report concludes that they "do not approach the level of a 100-to-1 quantity ratio."  1995 Report at xiv.

Analyzing information not considered at the time the existing ratio was adopted, the Commission found that the 100-to-1 penalty ratio (i) cannot be justified by the physiological effects of the two forms of cocaine, 1995 Report at 182-83; (ii) has a disparate impact on blacks (in the last fiscal year for which data was available, 88.3% of crack defendants were black, 7.1% were Hispanic, and only 4.1% were white), Crack Report at 161, Table 13; (iii) creates higher penalties for street dealers than for their more culpable supplier, Crack Report at 174; (iv) effects a double punishment on crack defendants in light of subsequent guideline changes, 1995 Report at xv; and (v) creates extraordinary disparities given the street values of the two forms of cocaine.[2]  1995 Report at 173, Table 19.

The 1995 Report concludes that the 100:1 ratio should be eliminated and replaced with specific sentence enhancements more closely tailored to the supportable harm associated with some crack cocaine offenses.  The Report states:

> The Sentencing Commission shares congressional and public concern about the harms associated with crack cocaine     - - both to users and to the society as a whole - - including the violence associated with its distribution, its use by juveniles, the involvement of women and juveniles in its distribution, and its addictive potential.  However, the Sentencing Commission concludes that Congress's objectives with regard to punishing

---

[2]  For example, at offense level 18, the street value of cocaine base was $115.  The street value of powder cocaine at the same offense level was $10,700.  1995 Report at 173, Table 19.

> crack cocaine trafficking can be achieved more effectively without relying on
> the current federal sentencing scheme for crack cocaine offenses that includes
> the 100-to-1 quantity ratio.

1995 Report at xiv.

By subsequently promulgating proposed amendments to the crack guidelines, the Commission acknowledged that it had not adequately considered factors bearing on the 100:1 sentencing disparity between crack and powder cocaine before enacting the guidelines presently in effect and in light of changes to other guidelines specifically addressing harms associated with some crack offenses. In short, "the Commission concluded that sufficient policy bases for the current penalty differential do not exist."

With respect to the crack cocaine guidelines, the 1995 Report demonstrated that the Commission by its own admission overlooked a number of factors which are relevant to the statutorily-defined sentencing purposes. The Commission acknowledged this in the 1995 Report and in its submission to Congress of a guidelines amendment proposing the equalization of the crack/powder cocaine penalties. 60. Fed. Reg. 25, 074 (May 10, 1995). The Commission admitted that its guidelines for crack cocaine offenses fail to consider "characteristics of the offense and the offender" other than "the quantity and form of cocaine." 1995 Report at I. "In a given case," other characteristics "can be equally or more important" to the determination of the "appropriate punishment." Id.

Among the factors that the Commission stated that it had not adequately considered are: (1) the geographic range of a defendant's illegal activity; (2) the profit to be reaped by a defendant; (3) a defendant's role as a retail street dealer rather than a wholesale distributor; (4) the lack of violence associated with the offense; (5) the absence of a weapon; (6) the flattening and inversion of penalties

vis a vis cocaine suppliers; (7) the absence of juveniles in the offense; and (8) the lack of psychopharmacologically induced crime. 1995 Report at 168-175; 193-197. Some of these factors were not adequately considered because they are subsumed in the current ratio although they may not be present in most cases or in a given case; other factors, when present in a case, are being doubly punished because of separate enhancements for the factor. Id. at 193-197.

The 1995 Report had also noted that there was some evidence suggesting that more violence was associated with trafficking and use of crack cocaine than with powder cocaine but that the evidence did not suggest that the increased level of violence "justifies a ratio as large as 100-to-1." 1995 Report at 197. Indeed, the data demonstrated that the form of cocaine involved in an offense is not as accurate an index of a defendant's dangerousness or propensity for violence as are the guideline enhancements expressly designed by the Commission to capture such characteristics. Id. at 166. Significantly, separate guideline enhancements did not exist when Congress first enacted mandatory minimums in 1986. "[T]o the extent that the guidelines now provide a punishment for some of those same factors subsumed in the ratio, those factors generate an enhancement both through an increased ratio differential and through guideline adjustments. In short, [crack cocaine defendants] are doubly punished through the interplay of the two structures." Id. at 196. The Commission concluded that the use of enhancements based on injury to victims, violence, possession of a weapon, and the like is a "distinctly fairer" approach than a penalty scheme that "relies exclusively or primarily on a quantity ratio to distinguish among offenders warranting greater punishment . . . " Id. at 199. The Commission acknowledged that the crack guidelines do not promote 'fairness' or 'just punishment' "because they punish less culpable crack dealers more severely than more culpable cocaine dealers and suppliers" and that "no policy basis for the present

100:1 sentencing differential exists".

As discussed above, the Commission, shortly after issuing the 1995 report, proposed a guideline that would have equalized the amounts of crack and powder under the guidelines. Congress voted to disapprove this amendment, but directed the Commission to further study the matter.

        2.      The 1997 Report

In April 1997, the Commission issued its second report, Special Report to the Congress: Cocaine and Federal Sentencing Policy (April 1997) ("1997 Report"). This 1997 Report also concluded that the crack/powder sentencing disparity was unwarranted.

In the 1997 Report the Commission carefully considered each factor listed in the congressional directive and evaluated current federal cocaine sentencing policy in relation to congressional goals for drug offense sentencing. The goals suggested that those who traffic in either powder or crack cocaine should be sentenced severely but that the current penalty differential between powder and crack cocaine sentencing must be reduced. See 1997 Cocaine Report at 3. The Commission concluded that the five-gram trigger for crack cocaine is "over inclusive" because it is indicative of a retail or street-level dealer rather than a mid-level or serious drug trafficker. Id. at 5. It further noted that if a street-level seller possessed a gun or engaged in violence in connection with such a sale, a sufficiently severe sentence could be imposed by virtue of specific guideline enhancements; but the five-year mandatory minimum penalty should not be triggered by such a small quantity. See id. at 506. The Commission also found that by 1997 nearly 90 percent of those convicted in federal courts for crack cocaine distribution were African Americans, while the majority of crack cocaine users were White. See id. at 8. As a result, the sentences are "harsher and more

8

severe for racial minorities than others," and the current penalty structure "results in a perception of unfairness and inconsistency."  Id.

After reviewing all the data related to the stated congressional goals for federal drug policy, the Commission again concluded that Congress' objectives can be "achieved more effectively without relying on the current federal sentencing scheme for cocaine offenses that includes the 100-to-1 quantity ratio."  1997 Cocaine Report at 9.  It unanimously reiterated its original core finding that, although research and public policy may support somewhat higher penalties for crack cocaine than for powder cocaine, a 100-to-1 quantity ratio simply "cannot be justified."  Id. at 2.  In coming to this conclusion, the Commission balanced the conflicting goals of congressional and public concern about the harms associated with both forms of cocaine - including the potential violence associated with its distribution in some cases, its use by juveniles, the involvement of juveniles in its distribution, and its addictive potential.  See id. at 9.  The Commission again recommended that Congress revise the federal statutory scheme for crack and powder cocaine offenses because hundreds of people continue to be sentenced under an unfair law.  See id. at 8-9.

3.     The 2002 Commission Report

        The Sentencing Commission recently issued a new Report to the Congress: Cocaine and Federal Sentencing Policy (May 2002) ("2002 Report").  In it, the "Commission again unanimously and firmly concludes that the various Congressional objectives can be achieved more effectively by decreasing substantially the 100-to-1 drug quantity ratio."  Id. at viii.  In reaching this conclusion, the Commission debunked a number of myths upon which the original disparity was apparently based.  The Commission made four main findings.  First, it found the current penalties exaggerate the relative harmfulness of crack cocaine.  Second, the current penalties sweep too broadly and apply

9

most often to lower level offenders. Third, the current quantity-based drug sentencing system overstates the seriousness of most crack offenses and fails to provide adequate proportionality. Fourth, the Commission concluded that the severity of the current penalties mostly impacts minorities. Id. at v-viii. The Commission proposed a model guideline amendment to remedy the problems with extensive modifications. Id. at A-1 to A-10.

With respect to race, the Commission stated:

> The overwhelming majority of offenders subject to the heightened crack cocaine penalties are black, about 85 percent in 2000 (see Chapters 5 and 8). This has contributed to a widely held perception that the current penalty structure promotes unwarranted disparity based on race. Although this assertion cannot be scientifically evaluated, the Commission finds even the perception of racial disparity problematic because it fosters disrespect for and lack of confidence in the criminal justice system. Moreover, to the extent that the 100-to-1 drug quantity ratio is shown to result in unduly severe penalties for most crack cocaine offenders, the impact of the severity falls primarily upon black offenders.

Id. at viii. The Commission further stated:

> One of the key issues surrounding the debate concerning the different penalty structures for crack cocaine offenses and powder cocaine offenses relates to the racial composition of federal crack cocaine offenders. The overwhelming majority of offenders subject to the heightened crack cocaine penalties are black, about 85 percent in 2000. This has contributed to a widely-held perception that the current penalty structure for federal cocaine offenses promotes unwarranted disparity based on race.
>
> In order to evaluate whether the crack cocaine penalties disproportionately impact blacks, data regarding the racial composition of the entire population of crack cocaine traffickers would be required. For example, if 85 percent of federally convicted and sentenced crack cocaine traffickers are black, the fact that the same percentage of all crack cocaine traffickers are black would tend to undermine the assertion of unwarranted disparity based on race. On the other hand, if 85 percent of federally convicted and sentenced crack cocaine traffickers are black, the fact that some lower percentage of all crack cocaine traffickers are black would tend to support the assertion of unwarranted disparity based on race. Although data regarding the racial composition of crack cocaine users are available, such data do not exist for crack cocaine

10

traffickers generally.  As a result, this assertion cannot be evaluated scientifically.

Nevertheless, the Commission finds even the perception of racial disparity to be problematic.  Perceived improper racial disparity fosters disrespect for and lack of confidence in the criminal justice system among those very groups that Congress intended would benefit from the heightened penalties for crack cocaine.

* * *

The fact that those same communities and many of their representatives now seek change in the federal cocaine penalty structure suggests a critical re-examination of the current penalty structure may be warranted.

Furthermore, to the extent that the preceding analysis has shown that the 100-to-1 drug quantity ratio results in unduly severe penalties for most crack cocaine offenders, the effects of the severity fall primarily upon black offenders.

Id. at 102-103.

4.     The 2004 Assessment

Even more recently, in its report, Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform (November 2004), the Commission again criticized the harsher penalties for crack.  The Assessment again noted the stark racial impact of this disparity:

In 2002, 81 percent of the offenders sentenced for trafficking the crack form of cocaine were African-American.  The average length of imprisonment of crack cocaine was 119 months, compared to 78 months for the powder form of the drug.  Average sentences for crack cocaine were 25 months longer than for methamphetamine and 81 months longer than for heroin.

Id. at 131 (footnotes omitted).

The Assessment further noted that:

The Commission has previously reported that the harms associated with crack cocaine do not justify its substantially harsher treatment compared to powder cocaine.

11

. . .

> For these and other reasons, the Commission has repeatedly recommended that the quantity thresholds for crack cocaine be revised upward. In 2001 (USSC, 2001) the Commission recommended that the crack threshold be raised to at least 25 grams from 5 grams, replacing the current 100-to-1 ratio with a 20-to-1 ratio.

Id. at 132. The Assessment concluded that:

> As shown in Figure 4.10, this one change to current sentencing law would reduce the gap in average prison sentences between Black and White offenders by 9.2 months. Among drug trafficking offenders only, the current gap is even wider -- 92.1 months for Blacks compared to 57.9 months for Whites -- and the reduction would be even greater, 17.8 months. This one sentencing rule contributes more to the differences in average sentences between African-American and White offenders than any possible effect of discrimination. Revising the crack cocaine thresholds would better reduce the gap than any other single policy change, and it <u>would dramatically improve the fairness of the federal sentencing system</u>.

Id. (emphasis added).

5.     <u>Cases</u>

The D.C. Circuit rejected the argument that a downward departure under the then-mandatory guidelines was permissible because of the unwarranted crack/powder sentencing disparity. <u>See</u> <u>United States v. Anderson</u>, 82 F.3d 436 (D.C. Cir. 1996). In <u>Anderson</u>, the defendant relied heavily upon the 1995 report to argue that such a departure was warranted. The court in <u>Anderson</u>, however, relied primarily upon the fact that the 1995 Report was not assigned official status under 18 U.S.C. § 3553(b), and thus the 1995 Report had essentially no bearing in departure analysis under the mandatory guidelines system. Id. at 440-41.

Notably, however, the majority in <u>Anderson</u> declined to address an argument that the disparity violated § 3553(a)'s requirements, claiming the defendant had not raised the issue. Id. at 441. The court noted that § 3553(a) had to be read in light of the express requirements of § 3553(b).

12

Id.

In dissent in <u>Anderson</u>, Judge Wald focused on § 3553(a):

> The majority's analysis is flawed because it stops short of asking the critical question: whether these cases fit into that very narrow category of circumstances where a policy statement or official commentary is <u>not</u> binding upon a sentencing court because it violates constitutional or statutory dictates. In light of the findings in the Special Report, it seems to me that applying the atypicality requirement to deny departure authority would violate a federal statute - - the Sentencing Reform Act itself. Section 3553(a) of the Sentencing Reform Act sets forth the factors a court must consider when sentencing under the guidelines, directing courts to impose a sentence which is "sufficient, but not greater than necessary" to achieve the goals of sentencing.
>
> . . .
>
> In usual cases, it is reasonably assumed that the Commission's guidelines adequately reflect these purposes. But that assumption falls apart in the exceptional situation where the Commission itself admits that its guidelines do not accomplish the four purposes of § 3553(a). To blindly adhere to the atypicality requirement even if doing so would plainly violate the mandates of § 3553(a) is to give no meaning at all to that provision - - an interpretation which would be at odds with basic tenets of statutory construction.
>
> . . .
>
> The nub of the problem here, of course, is that the *Special Report* is a startlingly forthright admission by the Sentencing Commission that its crack guidelines violate § 3553(a)'s instructions that a court impose a sentence "sufficient, but not greater than necessary" to "reflect the seriousness of the offenses" and "provide just punishment."
>
> . . .
>
> The[ ] acknowledgments by the Commission itself - - that crack sentences raise "[i]ssues of 'fairness' or 'just punishment'" because they punish less culpable crack dealers far more severely than more culpable cocaine dealers and suppliers, and that no policy basis for the present 100:1 sentencing differential exists - - make it impossible to square the crack guidelines with the sentencing purposes of § 3553(a). For this reason, I believe a district court is authorized to disregard the atypicality requirement and, though it should proceed cautiously in this largely unchartered terrain, to grant a departure if it determines that application of the crack guidelines to the case it before it will, in fact, plainly violate § 3553.

Id. at 446-48 (Wald, J., dissenting).

In <u>In re Sealed Case</u>, 292 F.3d 913 (D.C. Cir. 2002), defendant argued that the Supreme

13

Court's decision in <u>Koon v. United States</u>, 518 U.S. 81 (1996), had overruled <u>Anderson</u>. The court, however, continued to adhere to the heartland analysis of § 3553(b), and relying upon <u>Anderson</u>, reaffirmed its decision that a departure for the crack/powder disparity could not be imposed.

The decision in <u>Booker</u> has eviscerated the rationale for the holdings in <u>Anderson</u> and <u>In re Sealed Case</u>. The Supreme Court in <u>Booker</u> excised § 3553(b)(1), the provision upon which the majority in <u>Anderson</u> relied for its decision, and made the guidelines advisory and a factor to be considered along with all the other factors set forth in § 3553(a). Thus, Judge Wald's dissent in <u>Anderson</u> now directly addresses the issue before this court. She cogently points out how the unwarranted crack/powder disparity violates § 3553(a)'s provisions.

Moreover, the current basis for the disparate treatment of crack and powder sentences, unfortunately, was permeated with racial considerations, reflected in Congress's disapproval in 1995 of the Commission's amendment that would have equalized the treatment of the two substances. The rejected amendment would have abolished the 100:1 ratio between crack and powder while creating or enhancing adjustments for violence and the use of minors in connection with drug trafficking offenses.

The members of Congress who voted to reject the equalization of the cocaine penalties repeatedly and unanimously explained their position in terms of their desire to protect African-Americans and other minorities living in inner city neighborhoods from the harm caused by the use and distribution of crack cocaine. The record of the Congressional debate of October 18, 1995, in which the House adopted the bill rejecting the equalization amendment that had already been adopted by the Senate, prominently reflects this motivation. <u>See</u> 104 Cong. Rec. H10256-10283 (daily ed. Oct. 18, 1995).

14

Consistent with <u>Booker</u> and the above discussion, many district courts are imposing sentences below the recommended guidelines because of the unwarranted disparity between crack and powder.  In <u>United States v. Smith</u>, 359 F.Supp.2d 771 (E.D. Wis. March 3, 2005), for instance, Judge Lynn Adelman of the Eastern District of Wisconsin dealt with a defendant facing a ten-year mandatory minimum sentence, whose guidelines range was 121-151 months, as a result of an offense level of 31 and a criminal history category of II.  The government, however, moved for a 6-level departure under U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e).  This would have resulted in a guidelines range of 70-87 months, but, because the § 3553(e) motion did away with the mandatory minimum sentence, the "extent of any departure granted is within the court's discretion."  <u>Smith</u> at 774.  Initially, Judge Adelman granted a 10-level departure for the substantial assistance.

Judge Adelman then thoroughly reviewed the Commissions's three reports, as well as other literature on the crack/powder disparity.  She noted that the "Commission has studied the issue in depth and concluded that the assumptions underlying the disparity between crack and powder are unsupported by data."  <u>Smith</u> at 778. She concluded, as had the Commission, that "none of the previously offered reasons for the 100:1 ratio withstand scrutiny."  <u>Id.</u> at 780.  She reviewed the Commission's efforts to eliminate the unwarranted disparity:

> In the present case, I concluded that adherence to the guidelines would result in a sentence greater than necessary and would also create unwarranted disparity between defendants convicted of possessing powder cocaine and defendants convicted of possessing crack cocaine.  The question then became what ratio to apply.  Everyone seems to agree that 100:1 is too high.

<u>Id.</u> at 781.

In <u>Smith</u>, the drugs were found in defendant's home.  There were 69.99 grams of crack and 653.19 grams of powder.  The district court converted this to 1528 kilograms of marijuana, in

15

accordance with the drug equivalency table in § 2D1.1 comment. (n.10).  The crack converted to 1399.80 kilograms of marijuana, and the powder to 130.63 kilograms.  Thus, the powder, which was almost ten times the quantity of crack, had no affect on the offense level.  The resulting offense level was 32.  There were also two loaded handguns in a dresser, which increased the offense level by 2 under § 2D1.1(b)(1).  With a three-level decrease for acceptance of responsibility, the adjusted offense level was 31.

The defendant in <u>Smith</u> also had two prior convictions, both for possessing marijuana.  He received "short jail terms" for the prior convictions.  This put him in criminal history category II.  The resulting guidelines range was 121-151 months.  Judge Adelman, however, ultimately decided to apply the roughly 20:1 ratio that would have resulted from the 2002 Report's recommendations and proposed guidelines restructuring.  This resulted in a guidelines range of 27-33 months.  Under all the circumstances, she imposed a sentence of 18 months.

In <u>United States v. Perry</u>, 389 F.Supp.2d 278 (D.R.I. September 16, 2005), because of the powder/crack disparity, the court sentenced a defendant to the mandatory minimum sentence of 120 months in a case where the advisory guideline range was 188-235.  In support of its position, the court stated that "it is virtually impossible to find any authority suggesting a principled basis for the current disparity in sentences."  <u>Perry</u> at 303.  Similarly, in <u>United States v. Williams</u>, 372 F. Supp.2d 1335 (M.D. Fla. 2005), the court reduced the sentence of a career offender from 360 months to 204 months based in part on the crack/powder disparity.

The approach taken in <u>Smith</u>, <u>Perry</u>, and <u>Williams</u> is being followed by district courts in the District of Columbia.  For example, Judge James Robertson addressed the fundamental unfairness of the powder/crack sentencing disparity in <u>Harris</u>, 2005 U.S. Dist. Lexis 3958 (D.D.C. 2005).  The

16

Harris case involved two small-time dealers of crack cocaine. In Harris, Judge Robertson noted the "astonishingly high ratio" of cocaine powder to cocaine base for the same sentence, and declined to impose a guideline sentence.[3] In doing so, the Court adopted the Sentencing Commission's findings from its 2002 Report to the Congress: Cocaine and Federal Sentencing Policy: (1) "that the Guidelines ranges for crack exaggerate the relative harmfulness of crack cocaine (in terms of addictiveness, prenatal cocaine exposure, use of crack by youth, and the feared epidemic of crack users);" (2) "that the Guidelines ranges sweep too broadly and apply most often to lower level offenders;" (3) "that the Guidelines ranges overstate the seriousness of most crack cocaine offenses and fail to provide adequate proportionality (weapons, violence, and minor co-participants are involved in smaller numbers than previously imagined);" and (4) "that the severity of the Guidelines ranges for crack mostly impacts minorities." Id. at *9. Judge Robertson concluded that "[t]hose findings are persuasive authority for the proposition that the sentencing ranges prescribed ... by the Guidelines are greater than necessary." Id.; see also United States v. Clay, 2005 WL 1076243, *6 (E.D. Tenn. 2005) (concluding that "the unjustified disparity in the 100:1 quality ratio for punishment between cocaine base or crack and powder cocaine" was on factor warranting a sentence lower than the advisory guidelines).

For the reasons discussed above, this Court should apply the 20:1 ratio and reduce Mr. Davis's sentence commensurately in this case. As noted, the resulting sentencing range is 57-71 months.

**B.    Because Mr. Davis Has Great Potential For Rehabilitation, A Sentence Well**

---

[3]    In addition to Judge James Robertson, counsel understands that Judges Richard W. Roberts and Paul L. Friedman of this Court have sentenced well below advisory guideline ranges based upon the crack/powder disparity.

17

**Below the Advisory Sentencing Guideline Range is Warranted.**

Mr. Davis has had a troubled life due primarily to his drug addiction and educational problems. With respect to his drug addiction, Mr. Davis has been abusing drugs for about twenty eight years. At age twenty, Mr. Davis began abusing heroin and crack cocaine. Initially, Mr. Davis used both drugs primarily on the weekend. Id.. But, his addiction for both drugs seriously worsened and Mr. Davis began abusing these drugs daily. Id.. Mr. Davis was abusing crack daily "during all hours" and, by the time he was thirty five years of age, he abused heroin "three to four times daily." Id.. Mr. Davis also experienced a period in his life when he abused powder cocaine. Id..

Undoubtedly, Mr. Davis's drug abuse has caused him serious problems. Mr. Davis acknowledged to the PSR writer that "his drug use would cause problems with family, friends, work, and police." PSR, ¶ 65. Mr. Davis's family and criminal history confirm Mr. Davis's statement. Mr. Davis has been treated as an "outcast" by his family and he has lacked family support largely because of his drug problem. PSR, ¶ 61. Due to his family problems, Mr. Davis has suffered serious stress in the past. About five years ago, Mr. Davis had suicide ideations as a result of family issues. PSR, ¶ 61. Additionally, Mr. Davis's criminal record reveals that drugs have been a problem for him. In fact, the the majority of Mr. Davis's convictions are for misdemeanor drug possession and drug paraphernalia possession offenses.

Mr. Davis also acknowledges that his drug use has caused him medical problems. Due to drug use, Mr. Davis had developed abscesses on his legs. In 2002, Mr. Davis had abscesses removed from his legs at Howard University Hospital. PSR, ¶ 65. Also, Mr. Davis suffered from gum disease as a result of his abuse of crack cocaine. PSR, ¶ 60. In 1993, Mr. Davis had teeth pulled because of the gum disease. Id..

Educationally, Mr. Davis has performed poorly in the past. Mr. Davis acknowledges that he has trouble with such basic skills as reading and writing. PSR, ¶ 66. Mr. Davis attended Dunbar Senior High School and his "transcripts reflect all D's." Id.. As a result of his poor performance, Mr. Davis was only able to complete the ninth grade. PSR, p. 2.

Since his arrest in this case, Mr. Davis has shown that he wants to completely change his lifestyle. First, Mr. Davis wants to eradicate his drug problem. In fact, Mr. Davis informed the PSR writer that he "wishes to resolve his drug problem through substance abuse treatment while he is incarcerated at the Federal Correctional Institute." PSR, ¶ 65. Second, Mr. Davis wants to improve his education. According the PSR, "Mr. Davis expressed a desire to receive tutoring for reading and other subjects and plans on earning his GED while in custody." PSR, ¶ 67. Third, Mr. Davis wants to establish a better relationship with his family members and he will seek to gain their support as he struggles through these difficult times. Mr. Davis has advised undersigned counsel that he wants to have a better relationship with his family and that he would like to have his family's support. At Mr. Davis's request, an investigator from the Federal Public Defender's Office contacted one of Mr. Davis's brothers. Based on this contact, Mr. Davis's brother, Gregory Davis, was glad to learn that Mr. Davis wants to change his life. Gregory Davis also advised that he will offer support to Mr. Davis and that he will encourage other family members to support Mr. Davis as well.

**C.     A Sentence of Sixty Months is Supported By the Sentencing Factors Discussed in 18 U.S.C. § 3553(a)(2).**

A sentence of sixty months will more than adequately reflect the seriousness of Mr. Davis's offense. See 18 U.S.C. § 3553(a)(2)(A). Mr. Davis's offense is a non-violent offense and there's no conduct associated with Mr. Davis's offense that involved violence. There's no evidence that Mr. Davis ever attempted to commit an act of violence or that he ever made any violent threats. For

these same reasons, a sentence of sixty months is also consistent with promoting respect for the law and with providing just punishment for Mr. Davis's offense.  See 18 U.S.C. § 3553(a)(2)(A). Additionally, because a sixty months sentence will require Mr. Davis to serve a significant time in jail, such a sentence will provide ample deterrence for Mr. Davis and anyone else who may consider committing a similar crime.  See 18 U.S.C. § 3553(a)(2)(B).

With the exception of a fifteen year old Attempted Distribution of Cocaine conviction, Mr. Davis has no serious convictions.  All of Mr. Davis's other convictions are for misdemeanor offenses.  As discussed above, most of Mr. Davis's criminal history involves misdemeanor drug offenses.  If Mr. Davis receives the drug treatment and family support he desires, he will likely be rehabilitated soon.  Therefore, a sixty months will adequately protect the community from any further crimes on the part of Mr. Davis.  18 U.S.C. § 3553(a)(2)(C).

**D.    Conclusion**.

For the various reasons discussed above, Mr. Davis should receive a sentence which is well below the advisory sentencing guideline range.  Based on all the factors present in this case, Mr. Davis submits that a sentence of sixty months is the most reasonable sentence the court can impose in this case.

Respectfully submitted,
A.J. Kramer
Federal Public Defender


_____/s/_____
Tony W. Miles
Assistant Federal Public Defenders
625 Indiana Avenue, N.W.
Washington, D.C.  20004
(202) 208-7500