**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CRIMINAL NO. 05-319 (RMC)** |
| | : | |
| **JEFFREY DAVIS** | : | |
| | : | |
| **Defendant.** | : | |

---

## MEMORANDUM IN AID OF RESENTENCING

Defendant Jeffrey Davis, through counsel, respectfully submits the following Memorandum in aid of his resentencing.

Mr. Davis was originally sentenced by this Court on February 17, 2006, in connection with the instant case.[1]  At his original sentencing hearing, Mr. Davis argued that, due to the gross and unwarranted disparity under the sentencing guidelines in the treatment of defendants convicted of offenses involving crack cocaine on the one hand and defendants convicted of offenses involving powder cocaine on the other hand, he should receive a below-Guidelines sentence in order to account for the disparity.  This Court declined to impose a below-Guidelines sentence and Mr. Davis was sentenced to a period of incarceration which fell within the 84 to 105 months guideline range which was applicable at the time of his sentencing.[2]  Since Mr. Davis's sentencing, the United States

---

[1] The instant case relates to Mr. Davis's conviction of Unlawful Possession With Intent to Distribute Five Grams or More of Cocaine Base (21 U.S.C. § 841(a)(1)).  The conviction is based upon a plea of guilty in which Mr. Davis entered on November 29, 2005.

[2] Mr. Davis received a sentence of eighty four months, a sentence which was at the very low end of the applicable guideline range.

Supreme Court has decided a case which addresses the crack/powder disparity argument raised by Mr. Davis.[3]  Because the Supreme Court case significantly impacts Mr. Davis's case, the United States Court of Appeals for the District of Columbia Circuit issued an Order on March 5, 2008, directing that Mr. Davis's case be remanded for resentencing.

Pursuant to the Court of Appeal's March 5 Order, Mr. Davis is currently scheduled for resentencing before this Court on August 1, 2008.  At his resentencing hearing, Mr. Davis requests that this Court recalculate his sentencing guidelines in accordance with the guidelines which are currently in effect[4] and impose a sentence of sixty months.

## ARGUMENT

## I.     THE POST-<u>BOOKER</u> SENTENCING FRAMEWORK.

Under Justice Breyer's majority opinion in <u>Booker</u>, the "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing. <u>See</u> 18 U.S.C. § 3553(a)(4)." <u>United States v. Booker</u>, 125 S.Ct. 738 (2005).  While holding that district courts should still consider the Guideline calculations and ranges for sentencing purposes, the remedial majority in <u>Booker</u> held that courts must consider all the purposes of sentencing set forth in 18 U.S.C. § 3553(a).  Pursuant to <u>Booker</u>, therefore, courts must treat the Guidelines as one, among several, sentencing factor.

Pursuant to 18 U.S.C. §§ 3562 and 3553(a) – which were explicitly endorsed by the Supreme

---

[3]<u>See</u> <u>Kimbrough v. United States</u>, 128 S.Ct. 558 (2007).

[4]As noted in the April 11, 2008, Memorandum from the United States Probation Office, due to amendments in the sentencing Guidelines Manual addressing the disparity in treatment between crack cocaine offenders and powder cocaine offenders, Mr. Davis's correct revised guideline range is now 70-87 months.

Court in <u>Booker</u> – sentencing courts should consider the need for the sentence imposed:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

> (B) to afford adequate deterrence to criminal conduct;

> (C) to protect the public from further crimes of the defendant; and

> (D) to provide the defendant with the needed educational and vocational training, medical care, or other correctional treatment in the most effective manner.

Specifically, courts should "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" set forth above.

Section 3553(a) further directs sentencing courts to consider the nature and circumstances of the offense, the history and characteristics of the defendant, the range of sentences available, the need to avoid unwanted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offenses charged.

Pursuant to 18 U.S.C. § 3661, also expressly endorsed by the <u>Booker</u> majority:

> No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purposes of imposing an appropriate sentence.

Section 3582 of Title 18 states that:

> [t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.

Taken together, the directives of <u>Booker</u>, as well as Sections 3553, 3661, and 3582 of Title

3

18, make it clear that sentencing courts may no longer consider the Guidelines alone in determining the appropriate sentence. After Booker, courts need not justify sentences outside the guideline range by citing factors that take the case outside the "heartland." Rather, as long as the sentence imposed is reasonable and supported by the factors outlined in Section 3553, courts may exercise their discretion in individual cases and impose sentences which are not within the proposed guideline range.

More recently, the Supreme Court reaffirmed that the Sentencing Guidelines are merely one factor to be considered by district courts when fashioning a reasonable sentence and that the Sentencing Guidelines are not to be weighed more heavily than other sentencing factors. See Rita v. United States, 127 S.Ct. 2456 (2007) and Gall v. United States, 128 S.Ct. 586 (2007). A sentencing court shall not simply presume that a sentence within the Guideline range is automatically reasonable or that a sentence within the Guideline range is more reasonable than a sentence outside of the Guideline range. Id.. The sentencing court further shall not presume that a sentence outside of the Guidelines range is unreasonable. Id.. By considering the Sentencing Guidelines along with all of the factors set forth 18 U.S.C. § 3553(a), "the sentencing court subjects the defendant's sentence to the thorough adversarial testing contemplated by federal sentencing procedure." Rita at 2465. It is critical for sentencing courts to consider all sentencing factors and to not give undue weight to the Sentencing Guidelines because, as the Supreme Court recently reemphasized, '[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.' Gall at 598 (quoting Koon v. United States, 518 U.S. 81, 113 (1996)).

## II.     A SENTENCE OF SIXTY MONTHS IS THE MOST REASONABLE SENTENCE IN THIS CASE.

Due to a combination of factors, the most reasonable sentence in this case is a sentence of sixty months. A sentence of sixty months is a fair sentence and such a sentence is warranted based on the purposes of sentencing set forth in 18 U.S.C. § 3553. Based on such factors as the unjustifiable disparate sentencing guideline ranges for crack and powder cocaine and Mr. Davis's characteristics, a sentence below the advisory guideline range is justified in this case. Mr. Davis submits that the proper sentence in this case is a sentence of sixty months.

### A.     Crack/Powder Cocaine Disparity.

This Court should impose a sentence which is below the 70-87 months guideline range to account for the significant crack/powder disparity built into the offense level for offenses involving crack cocaine. As set forth below, the dramatic disparity between sentences for powder and crack cocaine is unwarranted. If that disparity is reduced to 20:1 – as advocated by the Sentencing Commission itself – Mr. Davis's offense level would be a 22. See U.S.S.G. § 2D1.1(c)(6) (offense level for between 3 and 4 grams of cocaine base and for between 300 and 400 grams of cocaine).[5] After reducing that offense level by 3 levels to account for Mr. Davis's acceptance of responsibility, Mr. Davis's Total Offense Level is 19 and his sentencing guideline range would be **57-71 months.**

In part, the argument against imposing a sentence that incorporates the drastic crack/powder disparity is based upon the Sentencing Commission's own disavowal of the basis for that disparity. The Commission's disavowal of the disparity has been made clear through several reports and

---

[5]     This offense level is arrived at by multiplying the total quantity of crack in this case (17.2 grams of crack) by 20, which converts it to powder. The resulting quantity is 344 grams, which produces a pre-acceptance offense level of 22 under the drug quantity table. See U.S.S.G. § 2D1.1(c)(9).

proposed amendments issued by the Commission. Certain sentencing factors set forth in 18 U.S.C. § 3553(a) and recent decisions by the United States Supreme Court provide further support for Mr. Davis's argument for a below Guidelines sentence in this case.

    1. <u>1995 Sentencing Commission Report</u>

In February 1995, the Commission issued the first report, <u>Special Report to the Congress:</u> <u>Cocaine and Federal Sentencing Policy</u> (Feb. 1995) ("1995 Report"). The Report repudiated the crack sentencing structure.

The 1995 Report is a comprehensive study which analyzes and considers the appropriate level of punishment to be imposed for crack offenses by the very agency charged by Congress to make sentencing determinations and recommendations. <u>See</u> 28 U.S.C. § 994. The report analyzes each factor perceived to be relevant to the distinction between crack and powder cocaine. Many of the factors were found to provide no support for a higher penalty for crack. Of "[t]he factors that suggest a difference between the two forms of cocaine," however, the Report concludes that they "do not approach the level of a 100-to-1 quantity ratio." 1995 Report at xiv.

Analyzing information not considered at the time the ratio was adopted, the Commission found that the 100-to-1 penalty ratio (i) cannot be justified by the physiological effects of the two forms of cocaine, 1995 Report at 182-83; (ii) has a disparate impact on blacks (in the last fiscal year for which data was available, 88.3% of crack defendants were black, 7.1% were Hispanic, and only 4.1% were white), Crack Report at 161, Table 13; (iii) creates higher penalties for street dealers than for their more culpable supplier, Crack Report at 174; (iv) effects a double punishment on crack defendants in light of subsequent guideline changes, 1995 Report at xv; and (v) creates extraordinary

disparities given the street values of the two forms of cocaine.[6]  1995 Report at 173, Table 19.

The 1995 Report concludes that the 100:1 ratio should be eliminated and replaced with specific sentence enhancements more closely tailored to the supportable harm associated with some crack cocaine offenses.  The Report states:

> The Sentencing Commission shares congressional and public concern about the harms associated with crack cocaine - - both to users and to the society as a whole - - including the violence associated with its distribution, its use by juveniles, the involvement of women and juveniles in its distribution, and its addictive potential.  However, the Sentencing Commission concludes that Congress's objectives with regard to punishing crack cocaine trafficking can be achieved more effectively without relying on the current federal sentencing scheme for crack cocaine offenses that includes the 100-to-1 quantity ratio.

1995 Report at xiv.

By subsequently promulgating proposed amendments to the crack guidelines, the Commission acknowledged that it had not adequately considered factors bearing on the 100:1 sentencing disparity between crack and powder cocaine before enacting the guidelines and in light of changes to other guidelines specifically addressing harms associated with some crack offenses. In short, "the Commission concluded that sufficient policy bases for the current penalty differential do not exist."

With respect to the crack cocaine guidelines, the 1995 Report demonstrated that the Commission by its own admission overlooked a number of factors which are relevant to the statutorily-defined sentencing purposes.  The Commission acknowledged this in the 1995 Report and in its submission to Congress of a guidelines amendment proposing the equalization of the

---

[6]  For example, at offense level 18, the street value of cocaine base was $115.  The street value of powder cocaine at the same offense level was $10,700.  1995 Report at 173, Table 19.

crack/powder cocaine penalties.  60. Fed. Reg. 25, 074 (May 10, 1995).  The Commission admitted that its guidelines for crack cocaine offenses fail to consider "characteristics of the offense and the offender" other than "the quantity and form of cocaine."  1995 Report at I.  "In a given case," other characteristics "can be equally or more important" to the determination of the "appropriate punishment."  Id.

Among the factors that the Commission stated that it had not adequately considered are: (1) the geographic range of a defendant's illegal activity; (2) the profit to be reaped by a defendant; (3) a defendant's role as a retail street dealer rather than a wholesale distributor; (4) the lack of violence associated with the offense; (5) the absence of a weapon; (6) the flattening and inversion of penalties vis a vis cocaine suppliers; (7) the absence of juveniles in the offense; and (8) the lack of psychopharmacologically induced crime.  1995 Report at 168-175; 193-197.  Some of these factors were not adequately considered because they are subsumed in the current ratio although they may not be present in most cases or in a given case; other factors, when present in a case, are being doubly punished because of separate enhancements for the factor.  Id. at 193-197.

The 1995 Report had also noted that there was some evidence suggesting that more violence was associated with trafficking and use of crack cocaine than with powder cocaine but that the evidence did not suggest that the increased level of violence "justifies a ratio as large as 100-to-1."  1995 Report at 197.  Indeed, the data demonstrated that the form of cocaine involved in an offense is not as accurate an index of a defendant's dangerousness or propensity for violence as are the guideline enhancements expressly designed by the Commission to capture such characteristics.  Id. at 166.  Significantly, separate guideline enhancements did not exist when Congress first enacted mandatory minimums in 1986.  "[T]o the extent that the guidelines now provide a punishment for

some of those same factors subsumed in the ratio, those factors generate an enhancement both through an increased ratio differential and through guideline adjustments. In short, [crack cocaine defendants] are doubly punished through the interplay of the two structures." Id. at 196. The Commission concluded that the use of enhancements based on injury to victims, violence, possession of a weapon, and the like is a "distinctly fairer" approach than a penalty scheme that "relies exclusively or primarily on a quantity ratio to distinguish among offenders warranting greater punishment . . . " Id. at 199. The Commission acknowledged that the crack guidelines do not promote 'fairness' or 'just punishment' "because they punish less culpable crack dealers more severely than more culpable cocaine dealers and suppliers" and that "no policy basis for the present 100:1 sentencing differential exists".

As discussed above, the Commission, shortly after issuing the 1995 report, proposed a guideline that would have equalized the amounts of crack and powder under the guidelines. Congress voted to disapprove this amendment, but directed the Commission to further study the matter.

2.    1997 Sentencing Commission Report

In April 1997, the Commission issued its second report, Special Report to the Congress: Cocaine and Federal Sentencing Policy (April 1997) ("1997 Report"). This 1997 Report also concluded that the crack/powder sentencing disparity was unwarranted.

In the 1997 Report the Commission carefully considered each factor listed in the congressional directive and evaluated current federal cocaine sentencing policy in relation to congressional goals for drug offense sentencing. The goals suggested that those who traffic in either powder or crack cocaine should be sentenced severely but that the current penalty differential

between powder and crack cocaine sentencing must be reduced. See 1997 Cocaine Report at 3. The Commission concluded that the five-gram trigger for crack cocaine is "over inclusive" because it is indicative of a retail or street-level dealer rather than a mid-level or serious drug trafficker. Id. at 5. It further noted that if a street-level seller possessed a gun or engaged in violence in connection with such a sale, a sufficiently severe sentence could be imposed by virtue of specific guideline enhancements; but the five-year mandatory minimum penalty should not be triggered by such a small quantity. See id. at 506. The Commission also found that by 1997 nearly 90 percent of those convicted in federal courts for crack cocaine distribution were African Americans, while the majority of crack cocaine users were White. See id. at 8. As a result, the sentences are "harsher and more severe for racial minorities than others," and the current penalty structure "results in a perception of unfairness and inconsistency." Id.

After reviewing all the data related to the stated congressional goals for federal drug policy, the Commission again concluded that Congress' objectives can be "achieved more effectively without relying on the current federal sentencing scheme for cocaine offenses that includes the 100-to-1 quantity ratio." 1997 Cocaine Report at 9. It unanimously reiterated its original core finding that, although research and public policy may support somewhat higher penalties for crack cocaine than for powder cocaine, a 100-to-1 quantity ratio simply "cannot be justified." Id. at 2. In coming to this conclusion, the Commission balanced the conflicting goals of congressional and public concern about the harms associated with both forms of cocaine - including the potential violence associated with its distribution in some cases, its use by juveniles, the involvement of juveniles in its distribution, and its addictive potential. See id. at 9. The Commission again recommended that Congress revise the federal statutory scheme for crack and powder cocaine offenses because

hundreds of people continue to be sentenced under an unfair law.  See id. at 8-9.

3.     2002 Sentencing Commission Report

In 2002, the Sentencing Commission issued another report entitled Report to the Congress: Cocaine and Federal Sentencing Policy (May 2002) ("2002 Report").  In it, the "Commission again unanimously and firmly concludes that the various Congressional objectives can be achieved more effectively by decreasing substantially the 100-to-1 drug quantity ratio."  Id. at viii.  In reaching this conclusion, the Commission debunked a number of myths upon which the original disparity was apparently based.  The Commission made four main findings.  First, it found the current penalties exaggerate the relative harmfulness of crack cocaine.  Second, the current penalties sweep too broadly and apply most often to lower level offenders.  Third, the current quantity-based drug sentencing system overstates the seriousness of most crack offenses and fails to provide adequate proportionality.  Fourth, the Commission concluded that the severity of the current penalties mostly impacts minorities.  Id. at v-viii.  The Commission proposed a model guideline amendment to remedy the problems with extensive modifications.  Id. at A-1 to A-10.

With respect to race, the Commission stated:

> The overwhelming majority of offenders subject to the heightened crack cocaine penalties are black, about 85 percent in 2000 (see Chapters 5 and 8). This has contributed to a widely held perception that the current penalty structure promotes unwarranted disparity based on race.  Although this assertion cannot be scientifically evaluated, the Commission finds even the perception of racial disparity problematic because it fosters disrespect for and lack of confidence in the criminal justice system.  Moreover, to the extent that the 100-to-1 drug quantity ratio is shown to result in unduly severe penalties for most crack cocaine offenders, the impact of the severity falls primarily upon black offenders.

Id. at viii.  The Commission further stated:

One of the key issues surrounding the debate concerning the different penalty structures for crack cocaine offenses and powder cocaine offenses relates to the racial composition of federal crack cocaine offenders. The overwhelming majority of offenders subject to the heightened crack cocaine penalties are black, about 85 percent in 2000. This has contributed to a widely-held perception that the current penalty structure for federal cocaine offenses promotes unwarranted disparity based on race.

In order to evaluate whether the crack cocaine penalties disproportionately impact blacks, data regarding the racial composition of the entire population of crack cocaine traffickers would be required. For example, if 85 percent of federally convicted and sentenced crack cocaine traffickers are black, the fact that the same percentage of all crack cocaine traffickers are black would tend to undermine the assertion of unwarranted disparity based on race. On the other hand, if 85 percent of federally convicted and sentenced crack cocaine traffickers are black, the fact that some lower percentage of all crack cocaine traffickers are black would tend to support the assertion of unwarranted disparity based on race. Although data regarding the racial composition of crack cocaine <u>users</u> are available, such data do not exist for crack cocaine <u>traffickers</u> generally. As a result, this assertion cannot be evaluated scientifically.

Nevertheless, the Commission finds even the perception of racial disparity to be problematic. Perceived improper racial disparity fosters disrespect for and lack of confidence in the criminal justice system among those very groups that Congress intended would benefit from the heightened penalties for crack cocaine.

* * *

The fact that those same communities and many of their representatives now seek change in the federal cocaine penalty structure suggests a critical re-examination of the current penalty structure may be warranted.

Furthermore, to the extent that the preceding analysis has shown that the 100-to-1 drug quantity ratio results in unduly severe penalties for most crack cocaine offenders, the effects of the severity fall primarily upon black offenders.

<u>Id</u>. at 102-103.

    4.    <u>The 2004 Assessment</u>

Even more recently, in its report, <u>Fifteen Years of Guidelines Sentencing: An Assessment</u>

12

of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform

(November 2004), the Commission again criticized the harsher penalties for crack.  The Assessment

again noted the stark racial impact of this disparity:

> In 2002, 81 percent of the offenders sentenced for trafficking the crack form of cocaine were African-American.  The average length of imprisonment of crack cocaine was 119 months, compared to 78 months for the powder form of the drug.  Average sentences for crack cocaine were 25 months longer than for methamphetamine and 81 months longer than for heroin.

Id. at 131 (footnotes omitted).

The Assessment further noted that:

> The Commission has previously reported that the harms associated with crack cocaine do not justify its substantially harsher treatment compared to powder cocaine.
>                              . . .
> For these and other reasons, the Commission has repeatedly recommended that the quantity thresholds for crack cocaine be revised upward.  In 2001 (USSC, 2001) the Commission recommended that the crack threshold be raised to at least 25 grams from 5 grams, replacing the current 100-to-1 ratio with a 20-to-1 ratio.

Id. at 132.  The Assessment concluded that:

> As shown in Figure 4.10, this one change to current sentencing law would reduce the gap in average prison sentences between Black and White offenders by 9.2 months.  Among drug trafficking offenders only, the current gap is even wider -- 92.1 months for Blacks compared to 57.9 months for Whites -- and the reduction would be even greater, 17.8 months.  This one sentencing rule contributes more to the differences in average sentences between African-American and White offenders than any possible effect of discrimination.  Revising the crack cocaine thresholds would better reduce the gap than any other single policy change, and it would dramatically improve the fairness of the federal sentencing system.

Id. (emphasis added).

     5.    The 2007 Amendment

Fully aware of the hostility the United States Congress has shown with regard to approving proposed amendments made by the United States Sentencing Commission in an effort to create a fair ratio between crack cocaine and powder cocaine offenses, the Sentencing Commission recently chose to propose a meager reduction in the disparity between crack and powder offense levels for the 2007 edition of the Guidelines Manual.  Specifically, the Sentencing Commission proposed to have the offense level for crack cocaine offenses reduced by two levels.  Significantly, the Sentencing Commission itself acknowledges that its 2007 proposed amendment for crack cocaine guidelines do not come close to solving the disparity problem.  In a report to Congress, the Sentencing Commission states the following:

> The Commission, however, views the amendment only as a partial remedy to some of the problems associated with the 100-to-1 drug quantity ratio.  It is neither a permanent nor a complete solution to those problems.  Any comprehensive solution requires appropriate legislative action by Congress.  It is the Commission's firm desire that this report will facilitate prompt congressional action addressing the 100-to-1 drug quantity ratio.

Report to the Congress, Cocaine and Federal Sentencing Policy, (May 2007) ("2007 Report"). Congress ultimately did not oppose the Sentencing Commission's proposed 2007 amendment and the amendment went into effect on November 1, 2007.

The November 1, 2007 Amendment did not come close to reducing the crack/powder disparity to the 20-to-1 ratio in which the Sentencing Commission deemed appropriate in its 2004 Assessment.  Nevertheless, the amendment did allow for a modest reduction in the sentencing guideline range which applies to crack cocaine offenders.  When applying the 2007 Guideline changes to Mr. Davis's case, his sentencing guideline range goes from 84-105 months to 70-87

months.[7]

> 6.    The *Kimbrough* Case

The United States Supreme Court has recently made clear that district court judges may impose a below guideline range sentence in order to account for the crack/powder disparity which exists in the sentencing guidelines.  United States v. Kimbrough, 128 S.Ct. 558 (2007).  The Court noted that such 18 U.S.C. § 3553(a) goals as fashioning a sentence which avoids unwarranted sentencing disparity and imposing a sentence which is not greater than necessary justify imposing a below Guidelines sentence in even basic ordinary crack cocaine cases.  Id..

In Kimbrough, the district court took into account the "disproportionate and unjust effect that crack cocaine guidelines have in sentencing," and imposed the mandatory minimum sentence on the crack conviction, which was well below the advisory guideline range, after contrasting the crack guidelines "with the range that would have applied had he been accountable for an equivalent amount of powder cocaine."  Kimbrough, 128 S.Ct. at 565.  The Supreme Court upheld the sentence in Kimbrough, noting the "Sentencing Commission's consistent and emphatic position that the crack/powder disparity is at odds with § 3553(a)."  Id. at 576.  The Court stated that the crack guidelines "do not exemplify the Commission's exercise of its characteristic institutional role" because:

> the Commission itself has reported that the crack/powder disparity produces disproportionately harsh sanctions, i.e., sentences for crack cocaine offenses "greater than necessary" in light of the purposes of sentencing set forth in § 3553(a). . . . Given all this, it would not be an abuse of discretion for a district court to conclude

---

[7]As noted above, If a 20-to-1 ratio were approved, Mr. Davis's Offense Level would be reduced by four levels and his Total Offense Level (after acceptance of responsibility) would be 19.  With a Total Offense Level of 19, Mr. Davis's sentencing guideline range would be 57-71 months.

when sentencing a particular defendant that the crack/powder disparity yields a sentence "greater than necessary" to achieve § 3553(a)'s purposes, even in a mine-run case.

Id. at 575.

Prior to the Supreme Court's decision in Kimbrough, the District of Columbia Circuit recognized "that a district court, in sentencing a defendant, may properly take into account the fact that the 100-to-1 ratio embedded in the Sentencing Guidelines for crack-to-powdered cocaine offenses bears no meaningful relationship to a defendant's culpability." United States v. Pickett, 475 F.3d 1347, 1356 (D.C. Cir. 2007) (Rogers, J., concurring). In her concurring opinion, Judge Rogers commended the opinion, noting that the Commission had stated that the 100-to-1 ratio "was unfair and produced extreme sentencing anomalies, thereby failing to accomplish the purposes set forth in . . . § 3553(a)." Id. at 1356 (footnote omitted). She concluded that failure to consider the problems associated with the crack guidelines

would frustrate the overarching purpose of a sentencing scheme to impose just punishments reflecting the seriousness of an offense and be contrary to the sentencing factors that Congress established in § 3553(a)(2).

Id. at 1357 (footnote omitted).

**B.     18 U.S.C. § 3553(a) Supports a Sentence of Sixty Months in this Case**.

1.     Nature and Circumstances of the Offense and the History and Characteristics of the Defendant (18 U.S.C. § 3553(a)(1))

Mr. Davis's involvement in the instant offense is clearly a consequence of his serious drug abuse problem. Mr. Davis has been abusing drugs for about twenty eight years and his history involves the abuse of such drugs as heroin, powder cocaine and crack cocaine. PSR, ¶ 64. Unsurprisingly, the drug Mr. Davis possessed with the intent to distribute in the instant case – crack

16

cocaine – is the drug he prefers to use.  PSR, ¶ 65.

Unlike many people who sell drugs, Mr. Davis did not commit the instant offense in pursuit of wealth or status.  Mr. Davis did not commit any acts of violence in connection with this offense and he did not possess a firearm in connection with the offense.  Mr. Davis became involved in the instant offense in a peaceful effort to obtain crack cocaine for his personal use.  In fact, Mr. Davis admitted to the Presentence Report Writer "that he sold illegal drugs to support his drug habit." PSR, ¶ 65.

After being arrested and charged in this case, Mr. Davis accepted responsibility for his behavior by entering into a guilty plea in connection with his conduct.  After entering his plea of guilty, Mr. Davis continued to accept responsibility during his initial sentencing hearing in this matter.

Regarding the history and characteristics of Mr. Davis, Mr. Davis has lived a very challenging life.  Although Mr. Davis grew up in a "normal" and supportive household, "his family struggled financially." PSR, ¶ 54.  Mr. Davis's family relied on public assistance in order to survive. Id..  While growing up, Mr. Davis had difficulty in school largely due to his poor reading and writing skills.  Despite his poor abilities, Mr. Davis continued struggling through school until his academic performance fell well below basic standards.  PSR, ¶ 66.  At that point, Mr. Davis decided to drop out of school.  Id..

With no high school diploma and poor skills, Mr. Davis became vulnerable to drug abuse. At the young age of twenty, Mr. Davis began using heroin and crack cocaine.  PSR, ¶ 64.  Initially, Mr. Davis limited his use of these drugs to the weekends.  Id..  At the age of 25, Mr. Davis added powder cocaine to his list of weekend drugs.  Id..  Mr. Davis's drug abuse escalated during his late

twenties and, as a consequence, he suffered his first arrest at the age of twenty eight. PSR, ¶ 28. Mr. Davis was ultimately convicted of a misdemeanor offense for possessing cocaine as result of this arrest. Id.. Because Mr. Davis's probationary sentence did not include any drug treatment, Mr. Davis continued suffering from his addiction to drugs. The failure to address Mr. Davis's drug problem inevitably lead to further arrests and convictions for Mr. Davis. See PSR, pp. 6-11. Sadly, Mr. Davis's sentences in these subsequent cases continued to neglect treating his substance abuse problem. Id.. While Mr. Davis did not have the benefit of participating in professional drug treatment programs, he did make some effort in trying to address his drug problem on his own. PSR, ¶ 64. Although his efforts had some short term success, they ultimately failed in the long run and Mr. Davis returned to abusing drugs. Id..

When Mr. Davis was in his mid-thirties, his drug problem seriously worsened. At this point, Mr. Davis was abusing heroin several times each day and he was using crack cocaine daily. PSR, ¶ 64. Mr. Davis continued to get arrested and convicted for drug related offenses and the criminal justice system continued to fail him by not providing him with any drug treatment. See PSR, pp. 6-11. Mr. Davis informed the PSR Writer that he now realizes that "his drug use would cause problems with family, friends, work, and police." PSR, ¶ 65. Mr. Davis's family "looks down on him" and treats him as an "outcast" because of his drug abuse. PSR, ¶ 61. At the time of his interview with the PSR Writer more than two years ago, Mr. Davis lacked family support. Id.. The feeling that his family had abandoned him caused Mr. Davis a great amount of stress and concern. Id..

Mr. Davis also acknowledges that his drug use has caused him medical problems. Due to drug use, Mr. Davis had developed abscesses on his legs. In 2002, Mr. Davis had abscesses removed

from his legs at Howard University Hospital. PSR, ¶ 65. Also, Mr. Davis suffered from gum disease as a result of his abuse of crack cocaine. PSR, ¶ 60. In 1993, Mr. Davis had teeth pulled because of the gum disease. Id..

Although Mr. Davis's situation seemed hopeless at the time he committed the instant offense three years ago, Mr. Davis showed signs that he could turn his life around after his arrest in 2005. While Mr. Davis was pending sentencing in this case, he developed a strong desire to eradicate his drug problem. In fact, Mr. Davis informed the PSR writer that he "wishes to resolve his drug problem through substance abuse treatment while he is incarcerated at the Federal Correctional Institute." PSR, ¶ 65. Mr. Davis also developed a determination to improve his educational situation while he was pending sentencing. According the PSR, "Mr. Davis expressed a desire to receive tutoring for reading and other subjects and plans on earning his GED while in custody." PSR, ¶ 67. Realizing the importance of family support, before his sentencing in 2006, Mr. Davis committed himself to establishing a better relationship with his family members. At that time, Mr. Davis advised undersigned counsel that he wanted to have a better relationship with his family and that he would like to have his family's support. In fact, the Office of the Federal Public Defender assisted Mr. Davis in reestablishing contact with his family and a brother of Mr. Davis stated that he would support Mr. Davis and that he would encourage other family members to support Mr. Davis as well.

Since Mr. Davis's original sentencing in this case, he has been in federal custody for about two years. During those two years, Mr. Davis has shown that he is indeed very serious about making the types of changes in his life that he promised to make at the time of his sentencing in 2006. Mr.

19

Davis participated in a drug treatment program and he completed the program on July 5, 2006.[8] April 11, 2008 Probation Office Memorandum, 2. Additionally, Mr. Davis is enrolled in a GED program at his place of incarceration. Id.. During a recent conversation with Mr. Davis and his counselor, Ms. Lee, undersigned counsel learned that Mr. Davis has been participating in the institution's GED program from about June 30, 2006 to the present. Undersigned counsel learned that Mr. Davis has passed two parts of a six part (or more) test. Based on a February 2008 progress report prepared by Mr. Davis's instructor, Mr. Davis is doing well in the class. See Exhibit 2. Mr. Davis's counselor recently advised undersigned counsel that Mr. Davis has been attending his GED class daily and that he is continuing to do well.

From April 18, 2006 to March 15, 2008, Mr. Davis had a food services job in the prison's kitchen. In a letter written while Mr. Davis was still employed in the kitchen, Mr. Davis is described as "an excellent worker, showing progress along the way." See Exhibit 3. Mr. Davis is further described as a person "able to carry out his work" and displaying "a positive attitude." Id.. In March of 2008, Mr. Davis left the kitchen job in order to start a janitorial job in the prison. Mr. Davis currently remains employed in this janitorial position. Overall, Mr. Davis's counselor indicates that Mr. Davis is "doing well" and that he does not cause any problems. His counselor notes that Mr. Davis has not received any disciplinary reports since he has been in the institution.[9] Mr. Davis's counselor is very impressed with his progress in the institution and his ability to successfully work

---

[8] Mr. Davis completed this drug treatment program only about five months after his original sentence and a Certificate of Completion was presented to Mr. Davis on June 30, 2006 due to his successful completion of the program. A copy of this certificate has been attached as Exhibit 1.

[9] The Probation Office's April 11, 2008 Memorandum confirms that Mr. Davis has not received any disciplinary reports.

and attend GED classes on a daily basis.

Mr. Davis has strengthened his ties with his family while he has been serving his sentence. In addition to his brother, Mr. Davis is now in touch with his mother. Mr. Davis is very happy to have the support of his brother and mother. Their support will greatly assist Mr. Davis when he reenters society. When Mr. Davis is released to the community, he plans to live with his mother. After staying with his mother for a moment, Mr. Davis hopes to become self sufficient and eventually move into a place of his own.

2.    Factors Pursuant to 18 U.S.C. § 3553(a)(2)

Admittedly, as with most offenses, possessing a controlled substance with the intent to distribute is fairly serious misconduct. Such misconduct, however, is not nearly as egregious as conduct involving violence or dangerous threats. Moreover, in this particular case, the seriousness of Mr. Davis's nonviolent offense is significantly mitigated by the fact that he was motivated solely by the desire to obtain drugs for himself and by the fact that there is no violent or threatening relevant conduct associated with his offense. Also, Mr. Davis's offense involved street level drug dealing rather than dealing at a more serious wholesale level. Mr. Davis's acceptance of responsibility in this case and his remarkable rehabilitation further lessen the seriousness of his offense. Due to these factors regarding the seriousness of this offense as well as Mr. Davis's history and characteristics, a sentence of sixty months is a sentence which will adequately promote respect for the law and such a sentence will provide just punishment for the offense.[10]

A sentence of sixty months will also provide ample deterrence for Mr. Davis and anyone else who may consider committing a similar crime. See 18 U.S.C. § 3553(a)(2)(B). A sixty months

---

[10] See 18 U.S.C. § 3553(a)(2)(A).

sentence will cause Mr. Davis to lose his liberty for a significant period of time. Such a substantial loss of liberty will surely deter Mr. Davis or any other similarly situated person from committing the type of offense Mr. Davis committed in this case.

Everything about Mr. Davis's conduct since his arrest in this case indicates that a sentence of sixty months is more than adequate for purposes of protecting the public from any further crimes by Mr. Davis. See 18 U.S.C. § 3553(a)(2)(C). Mr. Davis's crime was clearly driven by his addiction to drugs and Mr. Davis has made great strides in resolving his drug problem. Additionally, Mr. Davis has improved his educational situation and he has gained important job skills. These improvements now place Mr. Davis in a much better position to gain employment when he returns to the community. With his drug problem under control, better prospects of employment, and family support, Mr. Davis will not pose any danger to the community when he is released.

Since Mr. Davis has already gained all of the benefits he can gain from programs and training in prison, further incarceration is not necessary to assist him with any educational, vocational, medical or other correctional training, treatment or care. See 18 U.S.C. § 3553(a)(2)(D). At this point, Mr. Davis will best be assisted by taking the skills and lessons he has learned while incarcerated to the community so that he can start a fresh, law abiding and productive life.

3.    The Kinds of Sentences Available (18 U.S.C. § 3553(a)(3))

Because a sixty months sentence is in compliance with the statutory mandatory five year minium sentence required in this case and because a sentence within the Sentencing Guidelines is clearly not mandatory, a sentence of sixty months is a sentencing option which is available to this Court.

4.    The Need to Avoid Unwarranted Sentencing Disparities (18 U.S.C. § 3553(a)(6))

The crack/powder cocaine disparity which has been discussed in detail above is a compelling reason for why a sixty month sentence is necessary in this case in order to avoid unwarranted sentencing disparities.

**C.      Conclusion**.

For the various reasons discussed above, Mr. Davis should receive a sentence below the advisory sentencing guideline range. Based on all the factors present in this case, Mr. Davis submits that a sentence of sixty months is the most reasonable sentence the court can impose in this case.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER


_____/s/_____
TONY W. MILES
Assistant Federal Public Defenders
625 Indiana Avenue, N.W.
Washington, D.C. 20004
(202) 208-7500

23